ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| PROTEC GmbH | ) ASBCA Nos. 61161, 61162 |
| | ) |
| Under Contract No. W912CM-14-D-0007 | ) |

APPEARANCES FOR THE APPELLANT:     Paul D. Reinsdorf, Esq.
                                   Attorney at Law
                                   Frankfurt/Main, Germany

                                   Steven J. Kmieciak, Esq.
                                   Seyfarth Shaw LLP
                                   Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
                                   Army Chief Trial Attorney
                                   Dana J. Chase, Esq.
                                   Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE SWEET

These appeals involve a contract between the Regional Contracting Office, Wiesbaden (government) and appellant PROTEC GmbH (PROTEC) to maintain and repair fire alarms, sprinklers, and suppression systems at the U.S. Army Garrison, Wiesbaden. The government issued an unsatisfactory Contractor Performance Assessment Reporting System (CPARS) rating and refused to pay some invoices. PROTEC submitted claims seeking to have the government revisit the CPARS assessment and pay the unpaid invoices. The contracting officer (CO) issued a final decision (COFD) denying those claims, which PROTEC appeals. The Board has previously issued decisions regarding motions filed in the subject appeals. *PROTEC GmbH*, ASBCA Nos. 61161, 61162, 61185, 18-1 BCA ¶ 37,010, and 18-1 BCA ¶ 37,064. The Board conducted a three-day hearing on entitlement.

PROTEC claims that the assessment inaccurately stated that PROTEC failed to follow the schedule, and that PROTEC used inadequately trained personnel. PROTEC also argues there were errors in the procedure the government used to create the report. PROTEC also claims that the government improperly refused to pay the unpaid invoices.

As discussed in greater detail below, the substance of the CPARS assessment was accurate because PROTEC did not follow the schedule, and some of its personnel did not possess contractually-required Gesellenbrief diplomas certifying their training. Moreover, PROTEC has not established standing to raise its procedural claims because PROTEC has not shown prejudice from any procedural errors. Finally, the government properly refused to pay the unpaid invoices because PROTEC did not follow the schedule, performed the work with personnel who lacked Gesellenbriefs, and submitted late invoices.[1] Thus, the appeals are denied.

## FINDINGS OF FACT

### I. Background on German Vocational Certifications

1. In Germany, the Handwerkskammer, or Chamber of Crafts, issues a Gesellenbrief Electrician (Gesellenbrief). The Gesellenbrief certifies that an electrician has received proper training and is qualified. The Industries und Handelskammer, or Chamber of Commerce, issues a different certificate called a Journeyman Electrician Apprenticeship Diploma (Journeyman Diploma). The Journeyman Diploma is similar to the Gesellenbrief in that it also certifies an electrician's training and qualification. However, the training an electrician undergoes to receive a Gesellenbrief and a Journeyman Diploma is different. The Gesellenbrief training is practical, and focuses upon preparing electricians to service residential and business customers directly. The Journeyman Diploma training, on the other hand, is academic, and focuses upon preparing electricians to work in an industrial environment. (Tr. 2/172-75, 3/93, 233-34, 236-37)

### II. Solicitation and Contract

2. On August 15, 2014, the government issued Solicitation No. W912CM-14-T-0019 (0019 Solicitation) for the maintenance, inspection, and repair of fire alarms, sprinklers, and suppression systems in various operation and maintenance (OMA) and Army Family Housing (AFH) facilities at U.S. Army Garrison, Wiesbaden (R4, tab 2).

3. PROTEC submitted an offer on September 3, 2014. Its offer did not include any Journeyman Diplomas or Gesellenbriefs for its personnel. Nor did PROTEC's offer include any indication as to whether its personnel possessed Journeyman Diplomas or Gesellenbriefs. (R4, tab 6(h))

---

[1] Because we find that the above reasons justified non-payment of the invoices, we do not address the government's other proffered reasons for not paying the invoices. The government's motion to strike addresses those other reasons, so we deny that motion as moot.

4. The government found PROTEC's offer to be technically acceptable (R4, tab 7 at 2; tr. 3/41-44). On September 28, 2014, the government awarded Contract No. W912CM-14-D-0007 (0007 Contract) to PROTEC based upon the 0019 Solicitation (R4, tab 1).

5. The 0007 Contract stated that "[t]he contractor shall not deviate from the approved maintenance schedule without prior approval of the" contracting officer representative (COR) (R4, tab 1 at 55). The 0007 Contract did not provide that the COR would make appointments with the customers (tr. 3/55).

6. Performance work statement (PWS) § 1.4.8.e stated that:

> The contractor shall ensure that its personnel performing required services have at least the following certificates: training diploma electrical engineering (unchanged German version "Gesellenbrief electricians") and have VdS/DIN 14675 certificates for fire alarm systems, sprinkler fire extinguishing systems and VdS for kitchen fire extinguishing systems for kitchen installations, FRYERS, grills (electric or gas).

(R4, tab 1 at 47)

7. The 0007 Contract also required PROTEC to "[s]ubmit invoices for the previous month's contract services in Wide Area Work Flow (WAWF) for approval by the COR No Later Than (NLT) the 10th working [day] of the next month." By stating that invoices had to be for "the previous month's contract services," the 0007 Contract required that each invoice be for no more than one month's services. (R4, tab 1 at 25 (emphasis added)) The 0007 Contract stated that "[b]efore invoicing in WAWF the performed services, the COR shall verify the draft invoice." However, the 0007 Contract did not authorize PROTEC to delay the submission of an invoice while PROTEC sought clarification from the CO of any COR decision regarding a draft invoice. (*Id*. at 51)

8. The 0007 Contract required the government to conduct a contractor performance evaluation in accordance with Federal Acquisition Regulation (FAR) Subpart 42.15 (R4, tab 1 at 25). FAR 42.1503(b)(1)—which is part of Subpart 42.15—provides that "[t]he evaluation should include clear relevant information that accurately depicts the contractor's performance, and be based on objective facts supported by program and contract or order performance data."

## III. Contract Administration

### A. Schedule

9. The 0007 Contract involved two types of buildings: (1) those—such as office buildings—that required an appointment before PROTEC could work in the building; and (2) those—such as soldiers' quarters—that did not require such an appointment. Approximately half of the buildings required an appointment. (Tr. 1/53-54, 132) The buildings requiring an appointment further broke down into high security buildings and lower security buildings. High security buildings requiring appointments constituted about 20 of the 400 buildings covered by the 0007 Contract—or approximately 5 percent of the buildings (tr. 3/11).

10. By October 17, 2014, the government had accepted PROTEC's proposed schedule (app. supp. R4, tab 58(l) at 1).

11. PROTEC failed to perform services in both high security buildings and other buildings in accordance with the approved schedule (app. supp. R4, tab 59(g); tr. 3/104).

12. The only excuse for not performing in accordance with the approved schedule offered by Ralf Wogawa—PROTEC's founder—and Melanie Brill—PROTEC's business manager—was that the COR insisted on making appointments for all buildings that required appointments—i.e., both high security buildings and lower security buildings (tr. 1/51-53, 77-78, 132-33, 138, 218). The COR, on the other hand, testified that he only insisted on making appointments for high security buildings (tr. 3/11). The COR's recollection is more consistent with the contemporaneous documents, which show that the COR only insisted on making appointments for "high security areas," and "special buildings," such as high security general's houses. Therefore, we credit the COR's testimony. We find that the COR insisted on making appointments for high security buildings only, and that the COR clearly communicated that limit to PROTEC. The COR's insistence on scheduling appointments in high security buildings does not explain PROTEC's failure to perform services in other buildings in accordance with the schedule. (App. supp. R4, tabs 14, 59(i) at 1-2, tab 59(h); tr. 2/112-13, 3/11-12)

### B. Training Certificates

13. All PROTEC personnel did not possess Gesellenbriefs. Some possessed Journeyman Diplomas. (App. supp. R4, tab 54; tr. 1/31-32, 2/114-15)

4

14. In October 2014, the government issued non-conformance reports (NCRs) 0001 and 0004, which documented that PROTEC was not complying with PWS § 1.4.8.e (app. supp. R4, tabs 7, 10).

15. In October 2014, the government requested that PROTEC provide Manufacturers' Training Certificates, which are different from Gesellenbriefs and Journeyman Diplomas (app. supp. R4, tab 58(e)).

16. At a November 18, 2014 performance meeting, the agenda included that PROTEC still had not submitted the required certificates (app. supp. R4, tab 59(g)).

17. On November 26, 2014, the COR emailed PROTEC asking for copies of the Gesellenbriefs for some PROTEC personnel (app. supp. R4, tab 14).

18. On December 15, 2014 and February 5, 2015, the CO issued memoranda for record in support of modifications, both of which stated that "[t]he contractor is determined to be responsible in accordance with FAR 9.104-1. They have satisfactorily performed contract services to date as confirmed by the COR." (R4, tabs 34, 74)

19. On June 12, 2015, the COR prepared an internal memorandum, which stated that "[a]fter checking the regulations and the contract...all certifications for all [personnel] and subcontractors are not sufficient and not provided." The memorandum continued by listing systems on which PROTEC did not possess valid certifications. The memorandum concluded that "[t]he contractor is not [providing] information[] and certifications." (App. supp. R4, tab 66(c) at 1-2)

20. At a July 14, 2015 performance meeting, the government again complained about the lack of Manufacturers' Training Certificates for all personnel (R4, tab 92 at 3).

C. Invoices

21. PROTEC documented its completion of maintenance and repairs—including the date it performed the maintenance or repairs—in work certificates (app. tr. ex. 1; tr. 1/156-60). PROTEC used the work certificates to create draft invoices (tr. 1/143, 3/220). Each invoice covered multiple work certificates (tr. 2/25-26). PROTEC submitted the draft invoices to the COR (tr. 1/158). Each draft invoice included a cover sheet which indicated the date PROTEC created the draft invoice—and work certificates (tr. 1/156-57). The draft invoice also might include other supporting documents, such as supplier invoices (app. supp. R4, tab 24). If the COR disapproved of a draft invoice, he returned it to PROTEC for revisions (app. supp. R4, tab 72; tr. 1/146, 2/21-24). Multiple cover sheets signified that the COR had returned a draft invoice for revisions (tr. 1/163-64). After PROTEC received the COR's approval of either an initial draft

5

invoice or a revised draft invoice, it submitted the final invoice in WAWF (tr. 2/24-25, 28). The government did not pay 30 of those invoices (unpaid invoices) (app. supp. R4, tabs 24-53).

22. For the unpaid invoices, as Table 1 shows, PROTEC did not submit the invoices for the previous month's contract services in WAWF within the tenth working day of the next month (*id.*).

## TABLE 1: UNPAID INVOICE DELAYS

| Invoice #[2] | Date Of Last Supplier Invoice, If Any | Month(s) And Year(s) Of Services (In Work Certificates) | Date Invoice Due[3] | Date Initial Draft Invoice Created[4] | Date Final Invoice Submitted In WAWF |
|---|---|---|---|---|---|
| 100197/15 | None | 12/14 to 01/15 | 01/14/15 | 03/16/15 | 03/16/15 |
| 100234/15 | 01/09/15 | 10/14 to 11/14, 01/15 | 11/14/14 | 03/20/15 | 03/31/15 |
| 100260/15 | None | 10/14 to 12/14 | 11/14/14 | 03/26/15 | 03/26/15 |
| 100261/15 | None | 10/14 to 12/14 | 11/14/14 | 03/26/15 | 03/26/15 |
| 100611/15 | None | 04/15 to 05/15 | 05/14/15 | 07/02/15 | 07/02/15 |
| 100638/15 | None | 05/15 | 06/12/15 | 07/22/15 | 07/22/15 |
| 100639/15 | None | 04/15 | 05/14/15 | 07/22/15 | 07/22/15 |
| 100641/15 | None | 02/15 to 05/15 | 03/13/15 | 06/11/15 | 07/22/15 |
| 100642/15 | None | 03/15 | 04/14/15 | 07/22/15 | 07/22/15 |
| 100648/15 | 02/13/15 | 02/15 to 03/15 | 03/13/15 | 03/20/15 | 07/31/15 |
| 100659/15 | None | 04/15 to 06/15 | 05/14/15 | 07/02/15 | 07/02/15 |
| 100668/15 | 05/15/15 | 04/15 to 07/15 | 05/14/15 | 07/29/15 | 07/29/15 |
| 100811/15 | None | 04/15, 07/15 | 05/14/15 | 09/17/15 | 09/17/15 |
| 100985/15 | 02/19/15 | 10/14 to 11/14, 02/15 | 11/14/14 | 12/10/15 | 12/10/15 |

[2] In this opinion, we omit the prefix "100001" from all invoice numbers.

[3] Because PROTEC was supposed to include only one month's services in an invoice, under the 0007 Contract, and the government could not partially pay an invoice, the "Date Invoice Due" column represents the tenth working day of the next month after the first month in which PROTEC provided billed-for services (R4, tab 1 at 25; tr. 2/165-66).

[4] The "Date Initial Draft Invoice Created" column indicates the date PROTEC created the first invoice cover sheet, and the "Date Final Invoice Submitted In WAWF" column indicates the date PROTEC created the last invoice cover sheet (tr. 1/156, 163-64).

6

| | | | | | |
|---|---|---|---|---|---|
| 101001/15 | 05/15/15 | 05/15 to 08/15 | 06/12/15 | 12/16/15 | 12/16/15 |
| 101002/15 | 07/20/15 | 04/15, 07/15 | 05/14/15 | 12/16/15 | 12/16/15 |
| 101004/15 | 01/09/15 | 08/15 | 09/14/15 | 12/16/16 | 12/16/16 |
| 100090/16 | 04/07/15 | 02/15 to 03/15 | 03/13/15 | 02/24/16 | 02/24/16 |
| 100091/16 | None | 04/15 to 06/15, 08/15 | 05/14/15 | 03/09/16 | 03/09/16 |
| 100092/16 | None | 07/15 | 08/14/15 | 02/25/16 | 02/25/16 |
| 100093/16 | 01/9/15 | 03/15 | 04/14/15 | 02/25/16 | 02/25/16 |
| 100097/16 | 02/26/15 | 10/14, 1/15 | 11/14/14 | 02/25/16 | 02/25/16 |
| 301141/16 | None | 06/15 to 07/15 | 07/14/15 | 06/01/16 | 06/01/16 |
| 301272/16 | None | 08/15 to 09/15 | 09/14/15 | 07/19/16 | Not uploaded |
| 301273/16 | None | 07/15 | 08/14/15 | 07/19/16 | Not uploaded |
| 301274/16 | None | 08/15 | 09/14/15 | 07/19/16 | Not uploaded |
| 301275/16 | None | 07/15 | 08/14/15 | 07/19/16 | Not uploaded |
| 301276/16 | None | 02/15 to 03/15 | 03/13/15 | 07/19/16 | Not uploaded |
| 301277/16 | None | 11/14, 03/15 | 12/12/14 | 07/19/16 | Not uploaded |
| 301278/16 | None | 04/15, 06/15 to 07/15, 09/15 | 05/14/15 | 07/19/16 | Not uploaded |

(App. supp. R4, tabs 24-53) Accordingly, we find that PROTEC did not timely submitted the unpaid invoices in accordance with the contract.

23. PROTEC does not dispute that it submitted the unpaid invoices late. Rather, Ms. Brill testified that there were four reasons PROTEC submitted the unpaid invoices late (tr. 1/146-47, 170, 2/34, 50-51, 3/226-27).

24. First, Ms. Brill testified that PROTEC submitted the unpaid invoices late because of delays receiving signed work certificates from the COR. However, PROTEC has not identified which specific invoices COR work certificate signature delays purportedly delayed. Nor has it quantified how many days of delay the COR work certificate signature delays purportedly caused in each instance. (Tr. 1/147) On the contrary, the unpaid invoices demonstrate that the COR did not sign most of the work certificates attached to the unpaid invoices. Moreover, when the COR signed and dated the work certificates, he did so within a few days of when PROTEC performed the documented services. Therefore, we find that the COR work certificate signature delays did not cause the late unpaid invoice submissions. (App. supp. R4, tabs 24-53)

25. Second, Ms. Brill testified that PROTEC submitted the unpaid invoices late because of delays receiving supporting supplier invoices. However, PROTEC has not explained why the suppliers delayed submitting invoices. Further, PROTEC has not identified which specific unpaid invoices the supplier invoice delays purportedly

7

delayed. Nor has PROTEC quantified how many days of delay the supplier invoice delays purportedly caused in each instance. (Tr. 2/50-51) On the contrary, as Table 1 demonstrates, PROTEC did not even submit supplier invoices to support 20 out of the 30 unpaid invoices.[5] Moreover, PROTEC received the supplier invoices for the other ten unpaid invoices months before it created the initial draft invoices. Therefore, we find that the supplier invoice delays did not cause the late unpaid invoice submissions. (App. supp. R4, tabs 24-53)

26. Third, Ms. Brill testified that PROTEC submitted the unpaid invoices late because of delays while the COR reviewed draft invoices. However, PROTEC has not identified which specific unpaid invoices COR draft invoice review delays purportedly delayed. Nor has it quantified how many days of delay COR draft invoice review delays purportedly caused in each instance. (Tr. 1/146, 2/34) On the contrary, as Table 1 demonstrates, the unpaid invoices already were late by the time PROTEC submitted the initial drafts for COR review because PROTEC did not even create the initial drafts of any of the unpaid invoices until after the tenth working day of the next month after PROTEC provided the billed-for services. Therefore, we find that the COR draft invoice review delays did not cause the late unpaid invoice submissions. (App. supp. R4, tabs 24-53)

27. Fourth, Ms. Brill testified that PROTEC submitted Invoice No. 100985/15 late because of government delays between when PROTEC sought clarification regarding how to charge for replacement batteries in March 2015, and when the CO provided clarification that PROTEC could not charge for the first €50 of battery costs in early July 2015 (tr. 1/170, 3/226-27).[6] However, even after that purported delay, PROTEC still submitted Invoice No. 100985/15 late. The tenth working day of the next month after PROTEC received clarification in July 2015 was August 14, 2015. Yet, PROTEC did not submit Invoice No. 100985/15 until about four months later, on December 10, 2015. (App. supp. R4, tab 28 at 5; tr. 1/169-70) Indeed, as Table 1 demonstrates, even after receiving clarification, PROTEC still submitted 18 of the 30 unpaid invoices late by submitting those unpaid invoices after August 14, 2015. Moreover, as Table 1 demonstrates, 4 of the 12 unpaid invoices submitted before August 14, 2015 already were several months late by the time PROTEC sought

---

[5] In particular, PROTEC only supported Invoice Nos. 100234/15, 100648/15, 100668/15, 100985/15, 101001/15, 101002/15, 101004/15, 100090/16, 100093/16, and 100097/16 with supplier invoices (app. supp. R4, tabs 24-53).

[6] Ms. Brill testified that PROTEC received clarification in late June 2015 or early July 2015 (tr. 1/170, 3/226-27). Whether the CO responded in late June 2015 or early July 2015 is immaterial. Out of an abundance of caution, we use the more appellant-friendly early July 2015 date.

clarification in March 2015.[7] And none of the eight remaining unpaid invoices contained work certificates in which PROTEC responded to the CO's clarification that PROTEC could not charge for the first €50 of battery costs by removing €50 for the batteries, as it had done with Invoice No. 100985/15. In fact, only one of those eight unpaid invoices even contained a supplier invoice for batteries, suggesting that almost none of those eight unpaid invoices were for batteries. Therefore, battery cost clarification delays did not cause the late unpaid invoice submissions. (App. supp. R4, tabs 24-53)

## IV. CPARS ASSESSMENT

28. In late January 2016, the government posted a final CPARS assessment, which included responses to appellant's replies to each of the original assessing official's comments (R4, tab 113).[8] The assessment referenced Michele Weisbecker as the "Assessing Official" (AO) and Laurie A. Hull as the "Reviewing Official" (RO) (*id.* at 12). Ms. Hull was also the Chief of Contracts for the Wiesbaden Regional Contracting Office, while Ms. Weisbecker was the Deputy (tr. 2/185, 3/142). However, with regard to the 0007 Contract, due to a shortage of contracting personnel in the office, Ms. Hull also functioned as the CO for the last four months of contract performance. We find that CO Hull, as the Chief of Contracts was a level above CO Weisbecker for the purposes of FAR 42.1503(d).

29. Among the numerous deficiencies noted in the CPARS are three that are relevant to this appeal. First, the CPARS assessment stated that "[f]rom the award date, services were not performed in accordance with the approved schedule" (R4, tab 113). Second, the government criticized PROTEC for "allowing non-trained personnel to operate and modify automated alarm systems" (gov't br., ex. G-3 at 4). Third, the CPARS assessment quoted PWS § 1.4.8.e as stating that:

> The contractor shall ensure that its personnel performing
> required services have at least the following certifications:
> training diploma electrical engineering (unchanged

---

[7] PROTEC submitted Invoice Nos. 100197/15, 100234/15, 100260/15, 100261/15, 100611/15, 100638/15, 100639/15, 100641/15, 100642/15, 100648/15 100659/15, and 100668/15 before September 14, 2015. Invoice Nos. 100197/15, 100234/15, 100260/15, and 100261/15 already were late by March 2015. (App. supp. R4, tabs 24-53).

[8] The government subsequently amended the rating (gov't br., ex. G-3). The amended CPARS assigned an unsatisfactory assessment in the areas of quality, schedule, management, and regulatory compliance (*id.* at 2).

9

German version "Gesellenbrief Elektrotechnik") and have
VdS/DIN 14675 certificates for fire alarm systems,
sprinklers[,] fire extinguishing systems[,] and VdS for
kitchen fire extinguishing systems for kitchen installations,
fryers, grills (electric or gas).

(*Id.* at 3)[9]

## V. Procedural History

30. On September 17, 2016, PROTEC submitted a certified claim regarding the CPARS assessment (R4, tab 114). The claim alleged "the assessment relied upon purported erroneous factual assertions and incorrect interpretations of the" PWS (*id.* at 3).

31. On September 23, 2016, PROTEC submitted a certified claim regarding the unpaid invoices (R4, tab 115).

32. A February 6, 2017 COFD addressed the CPARS assessment and unpaid invoice claims together (R4, tab 122 at 7-8). The COFD corrected one error in the CPARS assessment,[10] but otherwise denied the claims (*id.* at 8). The COFD rejected the claims for several reasons, three of which are relevant to this appeal. First, the COFD found that PROTEC did not follow the schedule (*id.* at 12). Second, the COFD found that PROTEC's personnel lacked Gesellenbriefs by quoting PWS § 1.4.8.e's Gesellenbrief requirement, and stating that "[t]he technicians [PROTEC] claims performed the required services were not properly certified in accordance with PWS Paragraph 1.4.8.e" (*id.* at 8-10). Finally, the COFD found that PROTEC submitted the unpaid invoices late, which prevented the government from verifying work (*id.* at 12).

33. These appeals followed.

---

[9] The CPARS assessment quoted PWS § 1.4.8.e in connection with its criticism of PROTEC for losing its Company Certification (R4, tab 113 at 5). The amended CPARS removed that criticism (gov't br., ex. G-3 at 5). However, the quotation from PWS § 1.4.8.e remains (*id.*). The government has moved to dismiss PROTEC's CPARS claims on the grounds that the amendment moots PROTEC's claim. That motion is denied because PROTEC still challenges other portions of the CPARS assessment. (App. br. at 57-65)

[10] In particular, the original CPARS assessment incorrectly indicated that the termination type was "default." The COFD corrected that evaluation to indicate that the termination type was "none." (R4, tab 122 at 7-8)

## DECISION

### I.  CPARS Assessment

PROTEC has not shown that the CPARS evaluation was unfair or inaccurate. In completing an assessment, the government must provide a contractor with a fair and accurate performance evaluation. *Colonna's Shipyard, Inc.*, ASBCA No. 56940, 10-2 BCA ¶ 34,494 at 170,140; *Versar, Inc.*, ASBCA No. 56857, 10-1 BCA ¶ 34,437 at 169,959. Here, as discussed in greater detail below, the government provided PROTEC with a fair and accurate performance evaluation.

### A.  The CPARS Assessment's Statement that PROTEC Failed to Perform in Accordance with the Schedule was Fair and Accurate

The statement that "services were not performed in accordance with the approved schedule" was fair and accurate (finding 29). It is undisputed that PROTEC failed to perform services in accordance with the approved schedule (finding 11; app. br. at 62). Rather, PROTEC argues that that failure was due to the COR's insistence on scheduling all appointments, which delayed the appointments (app. br. at 62). However, the COR only insisted on scheduling appointments in the high security buildings (finding 12). Those buildings only constituted approximately 20 of the 400 buildings covered by the 0007 Contract—or approximately 5 percent of the buildings (finding 9). The COR's insistence on scheduling appointments in high security buildings does not explain—let alone justify—PROTEC's failure to perform services in accordance with the approved schedule in the far more numerous other buildings (finding 12). Independent of any excused failure to perform services in the high security buildings in accordance with the approved schedule, the unexcused failure to perform services in accordance with the approved schedule in the other buildings itself justified the CPARS' assessment's statement that PROTEC failed to perform services in accordance with the approved schedule.

PROTEC also argues that, even if the COR insisted on scheduling appointments only for high security buildings, PROTEC was unaware of that limitation because the COR did not communicate that limitation to PROTEC (app. reply at 32). That argument is meritless. The contemporaneous documents show that the COR expressly communicated to PROTEC that his insistence on scheduling appointments only applied to "high security areas," and "special buildings" (finding 12). Therefore, the CPARS' statement that PROTEC failed to perform services in accordance with the approved schedule was fair and accurate.

11

**B. The CPARS Assessment's Statement that PROTEC Used Non-Trained Personnel was Fair and Accurate**

The CPARS assessment's statement that PROTEC allowed "non-trained personnel to operate and modify automated alarm systems" was fair and accurate because all of PROTEC's personnel did not possess contractually-required Gesellenbrief training diplomas (findings 13, 29).[11] The 0007 Contract required that "[t]he contractor shall ensure that its personnel performing required services have at least the following certificates: training diploma electrical engineering (unchanged German version "Gesellenbrief electricians)" (finding 6 (emphasis added)). Here, it is undisputed that all of PROTEC's personnel did not possess Gesellenbrief training diplomas (finding 13). Because some of PROTEC's personnel lacked contractually-required training diplomas, the CPARS assessment's statement that PROTEC used non-trained personnel was fair and accurate.

PROTEC argues that its personnel possessed Journeyman Diplomas, which were equivalent to Gesellenbriefs (app. br. at 61). However, a Journeyman Diploma was not a Gesellenbrief, and the 0007 Contract required that personnel possess a "Gesellenbrief" (findings 1, 6). The 0007 Contract did not require a "Gesellenbrief or its equivalent" (finding 6). To accept PROTEC's argument would require us to rewrite the 0007 Contract by adding the "or its equivalent" language. We cannot do that absent extraordinary circumstances—such as a mutual mistake—which PROTEC does not argue existed here. *AECOM Gov't Serv., Inc.*, ASBCA No. 56861, 11-1 BCA ¶ 34,667 at 170,772; app. br.[12]

---

[11] PROTEC also argues that the CPARS assessment's inaccurately stated that the 0007 Contract required "[t]he contractor shall ensure that its personnel performing required services have at least the following certificates: training diploma electrical engineering (unchanged German version Gesellenbrief electricians) and have VdS/DIN 14675 certificates for fire alarm systems, sprinkler fire extinguishing systems" (app. br. at 58-60). That argument is meritless because that is a fair and accurate quote from PWS § 1.4.8.e (finding 6).

[12] It is not our place to second-guess the soundness of the government's decision to require Gesellenbriefs, as opposed to Journeyman Diplomas. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010); *CDM Constructors, Inc.*, ASBCA No. 60454, 18-1 BCA ¶ 37,190 at 181,016 n.15. In any event, we note that, given the 0007 Contract's requirement that PROTEC personnel service OMA and AFH customers, it was reasonable for the government to conclude that Gesellenbrief training—which emphasizes preparing electricians to provide services directly to homeowners or small businesses—was more relevant than Journeyman Diploma training— which emphasizes preparing electricians to work in an industrial environment (finding 1).

12

PROTEC also argues that the government waived the Gesellenbrief requirement because its technical evaluation team determined that PROTEC was qualified to perform the 0007 Contract (app. br. at 61). However, PROTEC's offer did not disclose that it would use personnel who possessed Journeyman Diplomas instead of Gesellenbriefs (finding 3). Therefore, the government's acceptance of PROTEC's offer does not constitute a knowing waiver of the Gesellenbrief requirement.

PROTEC next argues that the Gesellenbriefs could not be the reported missing training certificates because the COR did not mention the Gesellenbriefs in his October 10, 2014 and June 12, 2015 emails, or at the November 18, 2014 performance meeting (app. br. at 61). However, on November 26, 2014, the COR asked PROTEC for Gesellenbriefs for its personnel (finding 17). Therefore, the contemporaneous evidence shows that the government communicated to PROTEC that Gesellenbriefs were among the training certificates that PROTEC failed to provide.

Similarly, PROTEC's argument that the CO did not raise the Gesellenbrief issue in the COFD fails legally and factually. Legally, "once an action is brought following a contracting officer's decision, the parties start...before the board with a clean slate." *Wilner v. United States*, 24 F.3d 1397, 1402 (Fed. Cir. 1994); *see also Fru-Con Constr. Corp.*, ASBCA No. 55197, 07-2 BCA ¶ 33,697 at 166,804; *Heyl & Patterson, Inc.*, ASBCA No. 43307, 96-2 BCA ¶ 28,515 at 142,399. Factually, the COFD raised the Gesellenbrief issue by quoting PWS § 1.4.8.e's Gesellenbrief requirement, and stating that "[t]he technicians [PROTEC] claims performed the required services were not properly certified in accordance with PWS Paragraph 1.4.8.e" (finding 32).

PROTEC finally argues that the facts that December 15, 2014 and February 5, 2015 memoranda for record stated that PROTEC had "satisfactorily performed contract services to date, as confirmed by the COR" precludes the government from arguing that PROTEC personnel lacked required training certificates (app. br. at 61; finding 18). However, when those statements are read in the context of the government's contemporaneous requests for training certificates, it is clear that, while the government may have been overly optimistic about PROTEC's ability to provide requested certificates when it issued the memoranda for record in late 2014 and early 2015, PROTEC ultimately was unable to provide such certificates (findings 13-20).

## C. PROTEC Does not Have Standing to Raise its Remaining CPARS Assessment Claims

PROTEC also claims that the procedures used by the government were not fair because a review was not performed at a level above the CO as required by FAR 42.1503(d) (app. post-hearing br. at 63-65). The government argues that we do not

13

possess jurisdiction over that claim because it is a new claim, and in any event, the argument is meritless (gov't post-hearing br. at 74-77). We need not—and do not—resolve the question of whether we possess jurisdiction because PROTEC does not have standing to raise that claim. Generally, in order for a contractor to have standing to raise a procedural claim, the contractor must show prejudice. *Todd Constr. L.C. v. United States*, 656 F.3d 1306, 1315-16 (Fed. Cir. 2011); *GSC Constr., Inc.*, ASBCA No. 58747, 14-1 BCA ¶ 35,714 at 174,868. Here, PROTEC has not shown prejudice because, as discussed above, it has not shown that the CPARS assessment would have been different but for the purported errors. Therefore, PROTEC does not have standing to raise the CPARS assessment procedure claim that it seeks to assert. Moreover, we found that CO Hull, as the chief of contracts, was a level above CO Weisbecker (the AO) for the purposes of FAR 42.1503(d) (finding 28). Accordingly, PROTEC's argument has no merit.

## II. The Government Properly Refused to Pay the Unpaid Invoices

The government properly refused to pay the unpaid invoices because PROTEC did not deliver the services in accordance with the contract requirements, and did not properly and timely submit invoices for those services. The government may refuse to pay an invoice if a contractor does not deliver the services in accordance with the contract requirements, or does not "properly and timely submit invoices for those services." *Al-Zhickrulla Est.*, ASBCA No. 52137, 03-2 BCA ¶ 32,409 at 160,430. It is a contractor's burden to show that the nonpayment was improper. *Id.* at 160,429-30.

Here, PROTEC has not shown that it delivered the billed-for services in accordance with the contract requirements. As discussed in greater detail above, PROTEC has not shown that it delivered the billed-for services in accordance with the approved schedule, as required by the 0007 Contract. Moreover, as discussed in greater detail above, PROTEC has not shown that it delivered the billed-for services in accordance with the contractual requirement that the personnel performing the services possess Gesellenbriefs.

Further, PROTEC has not shown that it properly and timely submitted the unpaid invoices. The 0007 Contract required PROTEC to "[s]ubmit invoices for the previous month's contract services in Wide Area Work Flow (WAWF) for approval by the COR No Later Than (NLT) the 10th working [day] of the next month" (finding 7). However, PROTEC failed to timely submit any of the unpaid invoices by the 10th working day of the next month after the month in which PROTEC provided the billed-for services (finding 22). Therefore, PROTEC did not properly and timely submit the unpaid invoices.

14

Indeed, PROTEC does not dispute that it submitted the unpaid invoices late (app. br. at 77). Rather, it argues that delays in receiving signed work certificates, supplier invoices and reviewed draft invoices justified the late unpaid invoice submissions generally, and that delays obtaining clarification regarding how to charge for batteries justified the late submission of Invoice No. 100985/15 in particular (*id.*; findings 23-27). However, PROTEC has not met its burden of showing that any of those excuses justified the late unpaid invoice submissions.

First, PROTEC has not shown that COR work certificate signature delays justified the late unpaid invoice submissions (app. br. at 77). PROTEC has not identified which specific unpaid invoices COR work certificate signature delays purportedly delayed (finding 24). Nor has it quantified how many days of delay the COR work certificate signature delays purportedly caused in each instance (*id.*). On the contrary, the unpaid invoices show that many of the work certificates that PROTEC submitted to support the unpaid invoices did not even contain the COR's signature (*id.*). Further, when the COR signed and dated a work certificate, he did so within a few days of when PROTEC performed the services (*id.*). Such isolated cases of waiting a few days to receive a signed work certificate do not explain—let alone justify—the extensive delays in submitting the unpaid invoices (*id.*).

Second, PROTEC has not shown that supplier invoice delays justified the late unpaid invoice submissions (app. br. at 77). Suppliers' delays only excuse a contractor's delay if the suppliers' delays themselves are excusable. *E&R Inc.*, ASBCA No. 48056, 95-2 BCA ¶ 27,745 at 138,338; *Maeda Gumi*, ASBCA No. 11122, 67-1 BCA ¶ 6144 at 28,487. Here, PROTEC has not even attempted to show that any supplier invoice delays were excusable (finding 25). In any event, PROTEC has not shown that the supplier invoice delays caused it to submit the unpaid invoices late. PROTEC has not identified which specific unpaid invoices the supplier invoice delays purportedly delayed (*id.*). Nor has it quantified how many days of delay the supplier invoice delays purportedly caused in each instance (*id.*). On the contrary, the unpaid invoices show that 20 of the 30 unpaid invoices were not even supported by supplier invoices (*id.*). Moreover, for the ten unpaid invoices supported by supplier invoices, PROTEC received the supporting supplier invoices months before it submitted each unpaid invoice (*id.*). Therefore, PROTEC has not shown that any supplier invoice delays caused—let alone justified—the late unpaid invoice submissions (*id.*).

Third, PROTEC has not shown that COR draft invoice review delays justified the late unpaid invoice submissions (app. br. at 77). PROTEC has not identified which specific unpaid invoices COR draft invoice review delays purportedly delayed (finding 26). Nor has it quantified how many days of delay COR draft invoice review delays purportedly caused in each instance (*id.*). On the contrary, the unpaid invoices show that the unpaid invoices already were late by the time PROTEC submitted the

15

initial drafts for COR review because PROTEC did not even create the initial drafts of any of the unpaid invoices until after the tenth working day of the next month after PROTEC provided the billed-for services (*id.*). Indeed, PROTEC sometimes waited a year or more after performing services to even create an initial draft invoice for the COR to review (*id.*). Therefore, PROTEC has not shown that COR draft invoice review delays caused—let alone justified—the late unpaid invoice submissions (*id.*).

Finally, PROTEC has not shown that battery cost clarification delays justified the late submission of Invoice No. 100985/15, or any other unpaid invoice (app. br. at 77; finding 27). The 0007 Contract did not authorize PROTEC to delay submission of an invoice while it sought to clarify the COR's decision with the CO (finding 7). In any event, even after receiving clarification, PROTEC still submitted Invoice No. 100985/15 late because it did not submit Invoice No. 100985/15 by the tenth working day of the next month after receiving clarification—i.e., by August 14, 2015 (finding 27). Indeed, even after receiving clarification, PROTEC still submitted 18 of the 30 unpaid invoices late, by submitting those unpaid invoices after August 14, 2015, (*id.*). Moreover, 4 of the 12 unpaid invoices submitted before August 14, 2015, already were late by the time PROTEC sought clarification in March 2015. And, none of the eight remaining unpaid invoices responded to the CO's clarification that PROTEC could not charge for the first €50 of battery costs by reducing the work certificates by €50, as PROTEC had done with Invoice No. 100985/15 (*id.*). In fact, only one of those eight invoices even appears to be for batteries (*id.*). As a result, PROTEC has not shown that battery cost clarification delays caused—let alone justified—the late submission of Invoice No. 100985/15, or any other unpaid invoice (*id.*).

CONCLUSION

These appeals are denied.

Dated: June 3, 2019

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

16

I concur

JOHN J. THRASHER
Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61161, 61162, Appeals of PROTEC GmbH, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals